UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

VICKI GUERRA,

                    Plaintiff,

          -vs-                           **No. 1:16-CV-00991 (MAT)**
                                         **DECISION AND ORDER**
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____

## I.    Introduction

Represented by counsel, plaintiff Vicki Guerra ("Plaintiff")
brings this action pursuant to Title II of the Social Security Act
(the "Act"), seeking review of the final decision of defendant the
Acting Commissioner of Social Security (the "Commissioner" or
"Defendant") denying her application for disability insurance
benefits ("DIB"). The Court has jurisdiction over this matter
pursuant to 42 U.S.C. § 405(g). Presently before the Court are the
parties' cross-motions for judgment on the pleadings pursuant to
Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons
discussed below, Plaintiff's motion is denied and the
Commissioner's motion is granted.

## II.   Procedural History

Plaintiff protectively filed an application for DIB on May 14,
2013, alleging disability as of April 18, 2013 due to back injury,
right ankle injury, left knee injury, and nerve damage.
Administrative Transcript ("T.") 105-106. Plaintiff's application
was initially denied. T. 119-21. At Plaintiff's request, a hearing

was held before administrative law judge ("ALJ") Donald T. McDougall on January 20, 2015, at which Plaintiff appeared with her attorney. T. 68-103. On May 7, 2015, the ALJ issued an unfavorable decision. T. 145-66. On October 25, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's determination the Commissioner's final decision. T. 1-7. Plaintiff thereafter timely commenced this action.

## III. The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ applied the five-step sequential evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920. Initially, the ALJ determined that Plaintiff met the insured status requirements of the Act through December 31, 2018. T. 50. At step one of the five-step sequential evaluation, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since April 18, 2013, the alleged onset date. *Id*.

At step two, the ALJ found that Plaintiff suffered from the severe impairments of major depressive disorder, vertebrogenic disorder, fracture and osteoarthritis of the left knee, and nerve damage to the left leg. *Id*. The ALJ further found that Plaintiff had the medically determinable but non-severe impairment of obesity. T. 51.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any listed impairment. T. 51. The ALJ

particularly considered Listings 1.02 (dysfunction of a major weight bearing joint), 1.04 (disorders of the spine), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders) in reaching this conclusion. T. 51-53.

Before proceeding to step four, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following additional limitations: must change position briefly (for a minute or two) at least every half hour; cannot climb ladders, ropes or scaffolds; cannot be exposed to heights or dangerous moving machinery; cannot kneel or crawl; can only occasionally balance, stoop, crouch, or climb ramps or stairs; cannot perform jobs involving fast-paced or assembly line work or other high quota work; cannot perform jobs involving high concentration of the kind required for highly skilled work; must be able to be off to task for up to 10% of the workday. T. 53.

At step four, the ALJ found that Plaintiff was capable of performing her past relevant work as a billing clerk and a unit clerk. T. 59. In the alternative, at step five, the ALJ relied on the testimony of a vocational expert ("VE") to conclude that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of cashier, cafeteria attendant, and stock checker.

T. 60. Accordingly, the ALJ found that Plaintiff was not disabled as defined in the Act. T. 60-61.

## IV. Discussion

### A. Scope of Review

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation omitted). Although the reviewing court must scrutinize the whole record and examine evidence that supports or detracts from both sides, *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted), "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003).

In this case, Plaintiff argues that the ALJ's RFC finding was not supported by substantial evidence. In particular, Plaintiff contends that (1) the ALJ erred at step two by failing to consider

all of Plaintiff's medically determinable impairments, (2) the ALJ
failed to properly evaluate the medical opinions of record, and
(3) the Appeals Council failed to properly consider new medical
evidence submitted to it.  The Court has considered these arguments
and, for the reasons set forth below, finds them without merit.

**B.   Step Two Analysis**

Plaintiff argues that the ALJ erred at step two of his
analysis because he failed to consider the severity of her
medically determinable impairments of neuropathy, neuritis, lumbar
radiculopathy, failed low back syndrome, meralgia paresthetica,
progressive foraminal stenosis, and thyroid disorder.[1]  Plaintiff
further contends that the ALJ's step two error continued into the
rest of his analysis, because he did not properly consider the
limiting effects of all her impairments.  The Court disagrees and,
for the reasons discussed below, finds that any error by the ALJ at
step two was harmless.

At step two, the ALJ is required to consider whether a
claimant's medically determinable impairments are severe.  Notably,
"[i]t is the claimant's burden to show at step two that she has a

---

[1]      Plaintiff identifies several other impairments that the ALJ allegedly
ignored in a footnote in her brief.  *See* Docket No. 14-1 at 24 n.24.  However,
it is well-established that arguments made only in footnotes need not be
considered by the Court.  *See, e.g., F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d
461, 471 n.1 (S.D.N.Y. 2014) ("It is well settled . . . that a court need not
consider arguments relegated to footnotes[.]" ); *cf. Diesel v. Town of Lewisboro*,
232 F.3d 92, 110 (2d Cir. 2000) ("We do not consider an argument mentioned only
in a footnote to be adequately raised or preserved for appellate review.")
(internal quotation omitted). Moreover, and as discussed further below, the ALJ's
RFC analysis in this case took into account all of Plaintiff's impairments and
limitations.

severe impairment." *Rye v. Colvin*, No. 2:14-CV-170, 2016 WL 632242, at *3 (D. Vt. Feb. 17, 2016) (internal quotation omitted). A step two error is not reversible and does not necessitate remand where the record is devoid of evidence that the allegedly omitted impairments were severe. *Id*. at *4 (declining to remand where the plaintiff did not "specify why each of these impairments [that he contended were omitted at step two] meets the regulatory definition of a 'severe' impairment").

Moreover, "[c]ourts have developed a specialized variant of harmless-error analysis with respect to Step 2 severity errors in social security proceedings. . . . [W]hen an administrative law judge identifies some severe impairments at Step 2, and then proceeds through [the] sequential evaluation on the basis of [the] combined effects of all impairments, including those erroneously found to be non severe, an error in failing to identify all severe impairments at Step 2 is harmless." *Snyder v. Colvin*, No. 5:13-CV-585 GLS/ESH, 2014 WL 3107962, at *5 (N.D.N.Y. July 8, 2014); *see also Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (step two error was harmless where all of the claimant's conditions "were considered during the subsequent steps"). "Specifically, when functional effects of impairments erroneously determined to be non-severe at Step 2 are, nonetheless, fully considered and factored into subsequent residual functional capacity assessments, a reviewing court can confidently conclude that the same result

would have been reached absent the error." *Snyder*, 2014 WL 3107962 at *5.

In this case, Plaintiff has failed to demonstrate that the ALJ erred at step two. As a threshold matter, the majority of the "impairments" Plaintiff claims the ALJ ignored are in actuality symptoms or subsets of the impairments specifically considered by the ALJ. For example, the ALJ found that Plaintiff had the severe impairment of vertebrogenic disorder, a broad condition that encompasses the back problems (such as lumbar radiculopathy, progressive foraminal stenosis, and failed low back syndrome) which Plaintiff now claims the ALJ ignored. Similarly, while Plaintiff claims that the ALJ ignored her diagnoses of peripheral neuropathy (damage to the peripheral nerves), meralgia paesthetica and lateral femoral cutaneous neuropathy (both of which refer to compression of a nerve in the thigh), and neuritis (inflammation of the peripheral nerves), the ALJ expressly found that Plaintiff suffered from "nerve damage to the left leg" at step two. T. 50. There is no requirement that the language used by the ALJ at step two mirror the terminology used by Plaintiff's physicians, so long as the ALJ properly analyzes Plaintiff's medically determinable impairments.

Plaintiff is correct that the ALJ made no mention of thyroid disorder at step two. However, while it is true that there are references to hypothyroidism in Plaintiff's medical record (*see*, *e.g.,* T. 480, 502), there is no evidence that this condition caused any limitations in Plaintiff's ability to perform work-related functions. Plaintiff has thus failed to show that the ALJ's step

two analysis omitted any severe impairments. *See Howard v. Comm'r of Soc. Sec.*, 203 F. Supp. 3d 282, 296 (W.D.N.Y. 2016) ("[T]he mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment is not, by itself, sufficient to render a condition severe.") (internal quotation omitted).

Moreover, even had the ALJ made an error at step two, it would have been harmless. The ALJ's analysis was thorough, and considered all of Plaintiff's impairments, including issues with her back, leg, and knee. First, at step three, the ALJ specifically considered the listings for dysfunction of a weigh-bearing joint and disorders of the spine, as well as the listings under "11.00 *Neurological*." T. 51-52. These listings encompass Plaintiff's various physical impairments, included her back, knee, hip, and nerve issues. Plaintiff has failed to present any evidence that her impairments meet or equal any listed impairment. *See Johnson v. Colvin*, No. 13-CV-1055-JTC, 2014 WL 6883606, at *5 (W.D.N.Y. Dec. 4, 2014) ("The claimant bears the burden of establishing that his or her impairments match a Listing or are equal in severity to a Listing.").

Second, in assessing Plaintiff's RFC, the ALJ thoroughly discussed and analyzed the medical evidence of record, including information related to Plaintiff's back, knee, hip, and nerve problems. The ALJ specifically noted Plaintiff's history of lower back pain radiating into her legs (T. 54), as well as her surgical history (including a total knee replacement in October 2013 and a

right L5-S1 laminal foraminotomy in February 2014) (T. 57)).
However, as the ALJ noted, the medical evidence of record showed
that Plaintiff's condition had significantly improved after her
knee and back surgeries. At an appointment with treating
orthopedist Dr. Nicholas Violante in October 2014, Plaintiff
reported that she was "very happy" with the results of her surgery,
that she was able to walk every day for exercise without using any
assistive devices, and that she had only occasional soreness after
extended walking or standing. T. 571. Dr. Violante noted that
Plaintiff was doing "very well." T. 572. Moreover, although
Plaintiff reported an increase in her knee pain to Dr. Violante in
January 2015, she was still able to walk three miles per day
unassisted. T. 609. Dr. Violante recommended that Plaintiff use a
knee brace, but indicated that she could continue to walk up to
three miles per day. T. 610.

Similarly, Plaintiff's treating physiatrist Dr. Jafar Siddiqui
noted in November and December 2014 that Plaintiff's back surgery
had provided "good relief of her back pain" and that she was
continuing to walk and lose weight. T. 583, 600. Based on the
medical evidence of record, the ALJ reasonably concluded that
Plaintiff was capable of performing a limited range of light work.
The ALJ's inclusion of limitations in Plaintiff's abilities to
climb, kneel, crawl, balance, stoop, crouch, and work near heights
or dangerous moving machinery, as well as his finding that
Plaintiff needed to allowed to change position briefly at least
every half hour, accounted for her back, knee, hip, and nerve

problems. *See* T. 53. There is no basis for Plaintiff's contention that the ALJ ignored any of her impairments in formulating his RFC finding. Accordingly, any step two error the ALJ may have committed was harmless in any event.

## B. Evaluation of Medical Opinions

Plaintiff also argues that the ALJ failed to appropriately consider and weigh the medical opinions of record. Specifically, Plaintiff takes issue with the ALJ's consideration of the opinions of treating physicians Dr. Violante, Dr. Siddiqui, primary care physician Dr. Lisa Mendonza, and neurosurgeon Dr. Michael Landi, as well as the opinion of consultative psychiatric examiner Dr. Renee Baskin. The Court has considered the ALJ's treatment of each of these opinions and finds no error.

### 1. Drs. Violante, Siddiqui, Mendonza, and Landi's Opinions

Drs. Violante, Siddiqui, Mendonza, and Landi provided several opinions regarding Plaintiff's functioning throughout the relevant time period, each of which was considered by the ALJ. On February 5, 2013 and May 8, 2013, Dr. Siddiqui opined that Plaintiff had a 50% temporary disability. T. 375, 385. On May 21, 2013, Dr. Siddiqui recommended that Plaintiff be taken out of work (though Plaintiff had actually stopped working weeks earlier, having been fired from her position as a hospital unit clerk due to an alleged HIPAA violation (T. 352)) and assessed her with a 75% temporary disability. T. 392. Dr. Siddiqui reiterated his assessment of a 75% temporary disability on June 10, 2013, July 5,

10

2013, June 2, 2014, July 25, 2014, November 3, 2014, and February 5, 2015.  T. 395-96, 404-405, 494, 519, 581, 630.

Turning to Dr. Landi, on July 30, 2013, Dr. Landi recommended that Plaintiff undergo a right L5-S1 laminoforaminotomy and assessed her as having a 75% temporary disability.  T. 417.  Dr. Landi repeated his assessment of a 75% temporary disability on August 13, 2013.  T. 424.  On August 28, 2013, Dr. Landi again opined that Plaintiff had a 75% temporary disability, but stated that she would be able to work after recovering from surgery.  T. 422-23.  At that time, Plaintiff needed to avoid lifting, carrying, pushing, pulling, walking, climbing, standing, stooping, bending, sitting, traveling by bus, and commercial driving.  T. 422.  On October 2, 2013, Dr. Landi again indicated that Plaintiff was 75% temporarily disabled.  T. 441.  At a post-operative visit on February 15, 2014, Dr. Landi adjusted his opinion to indicate that Plaintiff had a 50% temporary disability.  T. 460.  Plaintiff was "doing well" after her surgery.  *Id.*  On March 25, 2014, Dr. Landi indicated that Plaintiff had a 30% temporary impairment (T. 476), and by May 27, 2014, he had lowered the percentage to a 25% temporary impairment (T. 478).

Primary care physician Dr. Mendonza completed a Mental Health Report related to Plaintiff on August 15, 2013.  T. 454-55.  Dr. Mendonza opined that Plaintiff had anxiety and depression.  T. 454.  In terms of functional limitations, Dr. Mendonza indicated that Plaintiff was "unable to concentrate" and was "tearfully despondent." *Id*. However, Plaintiff's "thought processes appear[ed]

clear" and she was "well groomed." *Id.* Dr. Mendonza indicated that Plaintiff was unable to use public transportation due to back and knee issues. *Id.* Dr. Mendonza also issued a letter on January 9, 2014 stating that Plaintiff was "on partial disability (75%) due to nerve damage sustained in her left leg after knee surgery." T. 456. Dr. Mendonza further stated that Plaintiff had "severe depression" and had been "recommended to see a psychiatrist." *Id.*

Finally, Dr. Violante opined on August 28, 2013 that Plaintiff was capable of returning to her previous occupation on light duty. T. 420. He indicated that she would have some limitations in lifting, carrying, pushing, pulling, and traveling by bus and that she should avoid walking, climbing, standing, or commercial driving. *Id.* However, Plaintiff had no limitations in sitting or personal driving. *Id.*

In his opinion, the ALJ considered all of the above-referenced opinions. With respect to the opinions that offered nothing more than a percentage rating of temporary disability, the ALJ afforded these opinions some weight, acknowledging that they had been offered by treating physicians, but also noting that they had been formulated for worker's compensation and not social security purposes, referred to Plaintiff's ability to perform her specific past employment and not work in general, and related to the ultimate issue of disability, which is reserved to the Commissioner. T. 55.

Turning to Dr. Mendonza's Mental Health Report, the ALJ again afforded this opinion some weight. T. 56. However, to the extent

Dr. Mendonza's opinion could be read as suggesting that Plaintiff was unable to concentrate at all, the ALJ rejected that conclusion, explaining that it was unsupported by Dr. Mendonza's treatment notes. *Id.*

Regarding Dr. Violante's and Dr. Landi's August 2013 opinions, the ALJ afforded Dr. Violante's opinion some weight and Dr. Landi's opinion little weight. T. 57. The ALJ explained that the opinions were inconsistent with one another and that the limitations identified therein were vague and for an uncertain duration. *Id.* The ALJ further noted that the opinions were unsupported by contemporaneous examination findings showing good strength and intact reflexes. *Id.*

The Court finds no error in the ALJ's consideration of Plaintiff's treating physicians' opinions. Under the Commissioner's regulations in effect at the time the ALJ issued her decision in this case, a treating physician's opinion is generally entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Green-Younger*, 335 F.3d at 106. An ALJ may give less than controlling weight to a treating physician's opinion if it does not meet this standard, but must "comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). The ALJ is required to consider "the length of the treatment relationship and the frequency of

examination; the nature and extent of the treatment relationship; the relevant evidence, particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues" in determining how much weight to afford a treating physician's opinion. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (quotation marks, alterations, and citations omitted). However, the ALJ need not expressly discuss each of these factors, so long as his "reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran*, 362 F.3d at 31–32).

Here, the ALJ adequately explained his reasons for affording Drs. Violante, Siddiqui, Mendonza, and Landi's opinions less than controlling weight. First, "the ALJ correctly noted that the determination of disability in the context of a workers' compensation claim uses a different standard than the Social Security Act." *Ackley v. Colvin*, No. 13-CV-6656T, 2015 WL 1915133, at *5 (W.D.N.Y. Apr. 27, 2015); *see also Crowe v. Comm'r of Soc. Sec.*, No. 6:01-CV-1579(GLS), 2004 WL 1689758, at *3 (N.D.N.Y. July 20, 2004) (workers' compensation claims are "governed by standards different from the disability standards under the Social Security Act"). As such, the ALJ was not bound by the treating physicians' conclusions that Plaintiff had varying degrees of disability for workers' compensation purposes.

The ALJ was also correct that, on the few occasions Plaintiffs' treating physicians identified specific functional limitations, those limitations were poorly defined and for an unspecified duration. For example, Dr. Violante's August 28, 2013 opinion indicated that Plaintiff had "some limitations" in lifting, carrying, pushing, and pulling, but offered no further information regarding the meaning of "some." T. 420. Similarly, while Dr. Landi indicated on August 28, 2013 that Plaintiff needed to "avoid" lifting, carrying, pushing, pulling, walking, climbing, standing, stooping, bending, sitting, traveling by bus, and commercial driving (T. 422), he did not explain what he meant by "avoid," and he indicated that Plaintiff would be able to return to work after her surgery. An ALJ may afford a treating physician's opinion less than controlling weight where it fails to provide useful information in assessing Plaintiff's functional limitations. *Gigliotti v. Berryhill*, No. 3:17-CV-00028 (MPS), 2018 WL 354597, at *11 (D. Conn. Jan. 10, 2018).

The ALJ also was permitted to afford less than controlling weight to opinions that were inconsistent with contemporaneous treatment records. *See, e.g., Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (finding that it is permissible for an ALJ to afford less than controlling weight to an treating physician's opinion where "it was contrary to his own treatment notes"); *see also Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) ("Because [the treating physician's] medical source statement

conflicted with his own treatment notes, the ALJ was not required to afford his opinion controlling weight."). In this case, Dr. Mendonza's treatment records did not support the conclusion that Plaintiff was wholly unable to concentrate. To the contrary, Dr. Mendonza observed that Plaintiff was alert and oriented (T. 503. 576), with clear thought processes and appropriate speech (T. 352, 448). Although Plaintiff did report that she was having difficulty concentrating (T. 448), there is no indication that Dr. Mendonza ever confirmed this self-report through clinical testing or other medically acceptable techniques. As such, the ALJ did not err in concluding that Dr. Mendonza's treatment records failed to support the conclusion that Plaintiff could not concentrate at all. The Court further notes that the ALJ did included some limitations in concentration in the RFC assessment, including findings that Plaintiff was incapable of fast-paced work and would be off task for up to 10% of the day. This conclusion is consistent with the ALJ's decision to afford Dr. Mendonza's opinion some weight.

Finally, the ALJ was correct that "whether an individual meets the statutory definition of disability is a matter reserved to the Commissioner, and thus that even a treating physician's view on that question is not afforded any special significance." *Ramos v. Comm'r of Soc. Sec.*, No. 13-CV-3421 (KBF), 2015 WL 7288658, at *6 (S.D.N.Y. Nov. 16, 2015); *see also Campbell v. Comm'r of Soc. Sec.*, No. 15 CIV. 2773 (AJP), 2016 WL 6462144, at *12 (S.D.N.Y. Nov. 1,

2016) ("conclusory statements" regarding a claimant's ability to work "are not entitled to controlling weight, whether in the context of a workers' compensation determination or otherwise"). The majority of the treating physician opinions in this case consisted of conclusory statements that Plaintiff had varying degrees of temporary disability. The ALJ was not required to give these opinions any special significance in his analysis.

For the foregoing reasons, the Court finds that the ALJ appropriately afforded Drs. Violante, Siddiqui, Mendonza and Landi's opinions less than controlling weight. The Court further finds that the ALJ was not obligated to recontact these medical sources prior to issuing an opinion. Under the Commissioner's regulations, the ALJ is required to recontact a treating physician only if the record is otherwise insufficient to permit a disability determination to be made. *See Kunkel v. Comm'r of Soc. Sec.*, No. 12-CV-6478 CJS, 2013 WL 4495008, at \*17 (W.D.N.Y. Aug. 20, 2013). In this case, the ALJ had a voluminous medical record, including reports showing the significant improvements Plaintiff had made following her surgeries. Moreover, Plaintiff is simply incorrect when she asserts that the ALJ "rejected" all of the medical opinions regarding Plaintiff's capabilities. *See* Docket No. 14-1 at 20. The ALJ gave some weight to several of Plaintiffs' treating physicians' opinions, including Dr. Violante's assessment of Plaintiff's functional limitations from August 2013. Under these

circumstances, the ALJ was not required to recontact Plaintiff's treating physicians for additional information.

### 2. Dr. Baskin's Opinion

Plaintiff further argues that the ALJ erred in his consideration of consultative examiner Dr. Baskin's opinion. Again, the Court finds no merit in this argument.

An ALJ has discretion to weigh the opinion of a consultative examiner and attribute the appropriate weight based on his review of the entire record. *See Burnette v. Colvin*, 564 F. App'x 605, 605 (2d Cir. 2014) (finding that the ALJ properly exercised his discretion in giving little weight to the consultative examiner's opinion, as it was inconsistent with the record as a whole). "There is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations," and the ALJ is free to disregard identified limitations that are not supported by the evidence of record. *Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013).

In this case, Dr. Baskin performed a psychiatric consultative examination of Plaintiff on July 8, 2013. T. 409-413. On mental status examination, Plaintiff was responsive and cooperative. T. 410. Her manner of relating, social skills, and overall presentation were all adequate. *Id*. Plaintiff's speech was fluent and clear and her expressive and receptive language were adequate. T. 411. Her thought processes were coherent and goal-directed, with no evidence of hallucinations, delusions, or paranoia. *Id*.

Plaintiff's affect was at full range and appropriate in speech and thought content and her mood was euthymic. *Id.* Plaintiff was appropriately oriented. *Id.* Her attention, concentration, recent, and remote memory skills were all mildly impaired due to distractiblity secondary to physical pain or discomfort. *Id.* Plaintiff's insight and judgment were good and her intellectual function was estimated to be in the average range. *Id.*

Dr. Baskin opined that Plaintiff would have minimal to no limitations being able to follow and understand simple direction and instructions, perform simple tasks independently, learn new tasks, perform complex tasks independently, make appropriate decisions, and relate adequately with others. T. 412. Plaintiff would have moderate limitations being able to maintain attention and concentration, maintain a regular schedule, and appropriately deal with stress. *Id.* In his decision, the ALJ afforded significant weight to Dr. Baskin's opinion, finding that it was consistent with her examination of Plaintiff and with the longitudinal record. T.56.

Plaintiff argues that the ALJ erred in his assessment of Dr. Baskin's opinion. Specifically, Plaintiff contends that although the ALJ purported to afford significant weight to Dr. Baskin's opinion, he failed to account for her findings that Plaintiff had moderate limitations in maintaining attention and concentration, maintaining a regular schedule, and appropriately dealing with stress. The Court disagrees. As set forth above, the

ALJ including multiple limitations in his RFC assessment related to Plaintiff's mental impairments, including findings that she could not perform fast-paced or high quota work, could not perform the high levels of concentration needed for skilled work, and would be off task for up to 10% of the day. T. 53. These limitations account for Dr. Baskin's findings. *See Lowry v. Comm'r of Soc. Sec.*, No. 115CV1553GTSWBC, 2017 WL 1290685, at *4 (N.D.N.Y. Mar. 16, 2017), *report and recommendation adopted*, No. 115CV1553GTSWBC, 2017 WL 1291760 (N.D.N.Y. Apr. 6, 2017) (moderate limitations in the ability to maintain concentration or a regular schedule or to deal with stress do not prevent a claimant from performing simple, routine work). The Court notes that all of the representative occupations identified by the ALJ at step five of his analysis are unskilled. *See* T. 60.

Plaintiff has not demonstrated that the ALJ ignored any of the limitations identified by Dr. Baskin. Accordingly, the Court finds no error in the ALJ's consideration of this medical opinion.

**C.    Consideration of Evidence Submitted to Appeals Council**

Plaintiff also argues that the Appeals Council failed to properly consider new material submitted to it in connection with her claim. The Court finds no merit in this contention.

A claimant may submit new evidence to the Appeals Council following an adverse ALJ disability determination without any showing of good cause. 20 C.F.R. §§ 404.970(b), 416.1470(b). The regulations provide that the Appeals Council "shall" consider "new"

and "material" evidence that relates to the period on or before the date of the ALJ hearing decision. 20 C.F.R. §§ 404.970(b), 416.1470(b). A claimant must show that the proffered evidence is (1) "'new' and not merely cumulative of what is already in the record," and that it is (2) "material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991) (internal citations omitted). "The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) (citing *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988)).

In this case, much of the material submitted to the Appeals Council did not relate to Plaintiff's condition during the relevant time period (that is, from the alleged onset date of April 18, 2013 to May 7, 2015, the date of the ALJ's decision). For example, Plaintiff submitted to the Appeals Council a Functional Capacity Evaluation completed by occupational therapist ("OT") Kevin King on July 23, 2015. OT King examined Plaintiff and concluded that she would have various limitations in postural and ambulation activities. T. 10. Plaintiff also submitted treatment notes from her physicians from after the relevant time period. The Appeals Counsel explaining that this information was "about a later time"

and did not relate to the relevant period.  T. 2.  The Court finds no error in this conclusion.

The Appeals Council is only required to consider "new and material evidence if it relates to the period on or before the date of the [ALJ's] hearing decision." *Miller v. Colvin*, No. 13-CV-6462P, 2015 WL 1431699, at *13 (W.D.N.Y. Mar. 27, 2015) (internal quotation omitted). Where a claimant submits "additional evidence that does not relate to the period on or before the date of the administrative law judge hearing decision," the Appeals Council will "send [the claimant] a notice that explains why it did not accept the additional evidence." 20 C.F.R. § 404.970(c).  In this case, OT King's report was based on a test performed on July 23, 2015, more than two months after the ALJ's decision. There is no indication that OT King had a longitudinal relationship with Plaintiff such that he could offer an opinion on her functioning during the relevant time period, nor does his assessment purport to be retroactive.  "While the existence of a pre-existing disability can be proven by a retrospective opinion, such an opinion must refer clearly to the relevant period of disability and not simply express an opinion as to the claimant's current status." *Vitale v. Apfel*, 49 F. Supp.2d 137, 142 (E.D.N.Y. 1999).  Moreover, Plaintiff has not identified any information in her physicians' notes from after the relevant time period that demonstrates limitations greater than those found by the ALJ. The Appeals Council thus properly declined to consider this information.

With respect to information from the relevant time period, contrary to Plaintiff's contention, the Appeals Council properly found that it did not call into question the ALJ's determination. For example, treatment notes from Dr. Siddiqui from February 2015 state that Plaintiff's condition is improving (T. 629) and that she is experiencing "good relief of her back pain" following surgery, with no side effects from her pain medications (T. 626). Similarly, Dr. Violante's notes from April 6, 2015 indicate that Plaintiff is ambulating unassisted, while his notes from April 23, 2015 state that Plaintiff is "doing well" apart from some drainage from her incision. T. 640, 644. X-rays of Plaintiff's left knee taken on April 23, 2015 showed neutral alignment, with no abnormal polyethylene wear, no component loosening, no lucent line, and no signs of infection. T. 646. On April 30, 2015, Dr. Violante indicated that Plaintiff was "doing great" and had full strength in her hamstrings and quadriceps, and that her left knee had 115 degrees of flexion with no discomfort. T. 647-48. The medical records submitted to the Appeals Council thus show an improvement in Plaintiff's condition, and provide no basis for disturbing the ALJ's conclusions. Plaintiff has failed to demonstrate any error by the Appeals Council.

## V.   Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Docket No. 14) is denied. The Commissioner's motion

for judgment on the pleadings (Docket No. 21) is granted. The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

**s/Michael A. Telesca**

_____

HON. MICHAEL A. TELESCA
United States District Judge

Dated:     August 7, 2018
           Rochester, New York.